UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DANIEL W. KEYS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-250 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Daniel W. Keys, on August 15, 2014. For the following reasons, the decision of the Commissioner is **AFFIRMED**.

*Background*

The plaintiff, Daniel W. Keys, filed an application for Disability Insurance Benefits and Supplemental Security Income on December 16, 2011, alleging a disability onset date of December 10, 2008. (Tr. 10). The Disability Determination Bureau denied Keys's claim on February 28, 2012, and again upon reconsideration on April 27, 2012. (Tr. 10). Keys subsequently filed a timely request for a hearing on June 7, 2012. (Tr. 10). A hearing was held on January 30, 2013, before Administrative Law Judge (ALJ) Patricia Melvin, and the ALJ issued an unfavorable decision on April 22, 2013. (Tr. 10–19). Vocational expert (VE) Sharon D. Ringenberg and Keys testified at the hearing. (Tr. 10). The Appeals Counsel denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–4).

The ALJ found that Keys met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 12). At step one of the five step sequential analysis for

determining whether an individual is disabled, the ALJ found that Keys had not engaged in substantial gainful activity since December 10, 2008, his alleged onset date. (Tr. 12). At step two, the ALJ determined that Keys had the following severe impairments: lumbar degenerative disc disease; spondylosis; bulging disc at C2-3 and C7-T1; back and neck pain; rheumatoid arthritis; osteoarthritis of the right knee, status post-surgery in 2011; and rotator cuff tear. (Tr. 12). Keys also suffered from headaches, but he testified that he had not received treatment for at least two years. (Tr. 13). The ALJ found no evidence that Keys's headaches limited his work-functionality for at least twelve continuous months. (Tr. 13). Therefore, the ALJ concluded that Keys's headaches were not a severe impairment. (Tr. 13).

The ALJ also concluded that Keys's depression did not cause more than a minimal limitation in his ability to perform basic mental work activities and was non-severe. (Tr. 13). In making this finding, the ALJ considered the Paragraph B criteria. (Tr. 13). She found that Keys had mild limitations in daily living activities. (Tr. 13). Keys reported difficulty performing chores such as folding laundry, mowing the lawn, and vacuuming. (Tr. 13). However, the ALJ found that Keys's physical rather than mental impairments caused those limitations. (Tr. 13). She also found that Keys had mild limitations in social functioning. (Tr. 13). Keys reported isolating behavior and minimal interaction with others outside his home. (Tr. 13). Nevertheless, the ALJ did not find that he had any apparent difficulties interacting with medical personnel. (Tr. 13).

The ALJ found that Keys had mild limitations in concentration, persistence, and pace. (Tr. 13). Keys testified that he had some difficulty with his memory and concentration. (Tr. 13). However, a February 2012 consultative examination demonstrated that Keys had good abstract reasoning, strong judgment and insight, good long-term memory, and adequate intermediate and

short-term memory. (Tr. 13). The ALJ found that Keys had not experienced any extended episodes of decompensation. (Tr. 13). She concluded that Keys's mental impairments were non-severe because they did not cause more than mild limitations in any of the functional areas and he had not experienced any extended episodes of decompensation. (Tr. 13). She also indicated that the Paragraph B limitations were not a residual functional capacity (RFC) assessment but were used to rate the severity of Keys's mental impairments at steps two and three of the sequential evaluation process. (Tr. 13).

The ALJ gave some weight to Dr. Martin's opinion, which included findings from her February 2012 psychological consultative examination. (Tr. 14). Dr. Martin concluded that Keys did not have clinical depression but found that he had impulse control disorder and adjustment disorder with depressed mood. (Tr. 14). The ALJ stated that the objective evidence did not support those diagnoses. (Tr. 14). She also gave some weight to the State agency psychological consultants' opinions, which found that Keys did not have severe mental impairments. (Tr. 14). She indicated that those opinions were consistent with Keys's medical history because he never received treatment for any mental impairments. (Tr. 14).

At step three, the ALJ concluded that Keys did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14). She indicated that the medical evidence did not support the required criteria for Listing 1.02, major joint dysfunction. (Tr. 14). Listing 1.02 required gross anatomical deformity, chronic joint pain and stiffness, signs of motion limitation or other abnormal motion of the affected joint, an inability to perform fine and gross movements or to ambulate effectively, and joint space narrowing, bony destruction, or ankylosis of the affected joint. (Tr. 14). Here, the evidence did not demonstrate that Keys had the required degree of difficulty in performing fine

3

and gross movements as defined in Listing 1.00(B)(2)(c) or in ambulating as defined in Listing 1.00(B)(2)(b). (Tr. 14). Additionally, the ALJ found that the medical evidence did not demonstrate nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as required by Listing 1.04. (Tr. 14). Furthermore, there was no evidence that Keys's back disorder prevented him from ambulating effectively, as defined in Listing 1.00(B)(2)(b). (Tr. 14). Last, the ALJ indicated that the evidence of Keys's rheumatoid arthritis failed to establish an inability to ambulate or to perform fine and gross movement. (Tr. 14).

The ALJ then assessed Keys's RFC as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ladders, ropes and scaffolds, can occasionally climb ramps and stairs, and can occasionally balance, stoop, kneel, crouch and crawl.

(Tr. 14). The ALJ explained that in considering Keys's symptoms she followed a two-step process. (Tr. 15). First, she determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Keys's pain or other symptoms. (Tr. 15). Then, she evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Keys's functioning. (Tr. 15).

Keys alleged disability based on back, neck, and knee pain. (Tr. 15). He reported intense back pain that increased if he walked or stood too long, described numbness and tingling from his knees to his toes, and stated that his back pain was generally 7 out of 10, but increased to 10 out of 10 if exacerbated. (Tr. 15). He testified that his neck pain varied from 6 to 10 out of 10 and that he received approximately eight injections each month that helped his neck pain. (Tr. 15). Keys alleged pain down his shoulder that made his hand tingle and made it hard to hold

4

things. (Tr. 15). He also reported arthritis pain in his wrists, ankles, and the pads of his feet and described his right knee pain, which increased while walking or using stairs, as someone scraping needles inside his knee. (Tr. 15). Keys had surgery to repair a torn rotator cuff and stated that his shoulder "pops out," which causes extreme pain, a few times per year. (Tr. 15). Keys testified that he could walk less than one block, could stand for only five minutes and sit for ten to fifteen minutes, could not lift a gallon of milk, and had difficulty grasping with his hands and pushing with his feet. (Tr. 15).

Keys underwent five surgeries on his back and neck, including a spinal fusion and the implantation of a cervical plate, received multiple injections in his back and neck, and had knee surgery for anterior cruciate ligament and medial meniscus tears. (Tr. 15). He also received medication and underwent physical therapy but has continued to complain of disabling pain. (Tr. 15). The ALJ found that Keys's impairments could cause his alleged symptoms but that his statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (Tr. 15–16).

Despite Keys's claims of physical limitations, the ALJ indicated that his physical examinations did not demonstrate particularly adverse objective signs or findings. (Tr. 16). On February 23, 2012, Dr. Onamusi performed a consultative examination and found that Keys had normal muscle power and tone, normal reflexes, preserved sensation to light touch, pain in all extremities, and negative Romberg sign. (Tr. 16). Keys had a normal gait, had no trouble getting onto or off the examination table, and could squat halfway, even though he was somewhat unsteady standing on his heels or toes. (Tr. 16). He could grip and grasp with each hand, had grip strength of twenty-five and thirty-five pounds in his right and left hand respectively, could reach forward, push, and pull with each arm, and could perform fine

coordination and manipulative tasks. (Tr. 16). Contrary to Keys's testimony, he could tie knots, do buttons, tie shoelaces, pick up coins, hold pens, pull zippers, and perform fine fingering movements. (Tr. 16). He had limited range of motion in his back and neck, moderate right shoulder and knee tenderness, and negative straight leg raising. (Tr. 16). Based on his physical capabilities, the ALJ found that the examination did not support Keys's allegations. (Tr. 16).

On April 6, 2012, Dr. William Hedrick examined Keys and found that he had negative Spurling's test bilaterally, no radicular symptoms, intact heel, toe, and tandem gait, and right positive straight leg raise. (Tr. 16). Keys had no sensory deficits in his hands or feet and normal muscle testing in his extremities. (Tr. 16). He tested positive for Tinel's test on the right and Phalen's test bilaterally and had weak pincher grasp and decreased palmer sensation on his left hand. (Tr. 16). However, these findings were not present on May 4, 2012 or June 29, 2012, when Keys denied numbness or weakness and reported improvement in his ability to bathe, cook, drive, eat, and walk. (Tr. 16).

The ALJ indicated that Keys's later physical examinations also were inconsistent with his allegations. (Tr. 16). On September 13, 2012, Keys stated that his pain had improved and that he ambulated with a normal, stable gait. (Tr. 16). On October 9, 2012, Keys indicated that he had no neck problems following his operation four weeks prior, and he denied feeling pain shooting into his extremities or feeling any numbness or tingling in his arms and legs. (Tr. 16). A physical examination demonstrated midthoracic spine tenderness, no cervical or lumbar spine tenderness, good arm and leg strength, intact sensation bilaterally, normal strength, and free movement. (Tr. 16). On November 28, 2012, Keys denied sudden onset arm and leg weakness, reported that a prior caudal epidural improved his pain by fifty percent, ambulated without

assistance with a slow, wide gait, and sat comfortably without difficulty or evidence of pain. (Tr. 16). Keys also complained of lower back pain but denied numbness or weakness. (Tr. 16).

Despite finding that Keys had significant functional limitations, the ALJ found that the record did not support Keys's allegations concerning the limiting effects of his pain. (Tr. 16). She concluded that the RFC fully accounted for Keys's limitations. (Tr. 17). The ALJ gave great weight to Dr. Onamusi's opinion because it was consistent with the medical evidence of record, particularly Keys's recent physical examinations. (Tr. 17). She also gave great weight to the opinions of the State agency medical consultants because their opinions were consistent with Keys's physical examinations and Dr. Onamusi's opinion. (Tr. 17). She gave little weight to the opinion of Victoria Keys, Keys's wife because her statements were not consistent with his physical examinations or statements. (Tr. 17).

At step four, the ALJ found that Keys could not perform his past relevant work. (Tr. 17). Considering Keys's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that he could perform, including cashier (1,000 jobs regionally, 20,000 jobs in Indiana, and 800,000 jobs nationally), retail marker (500 jobs regionally, 7,000 jobs in Indiana, and 300,000 jobs nationally), and furniture rental consultant (400 jobs regionally, 4,000 jobs in Indiana, and 200,000 jobs nationally). (Tr. 18).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097

7

(7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62. An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work

8

activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see* **Williams v. Colvin**, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Keys has claimed that the ALJ evaluated whether his conditions met or medically equaled a listed impairment improperly. For a claimant to show that he meets a listed impairment, he must demonstrate that his impairment meets each required criterion, and he bears the burden of proof in showing that his condition qualifies. **Maggard v. Apfel**, 167 F.3d 376, 380 (7th Cir. 1999). A condition that meets only some of the required medical criteria, "no matter how severely," will not qualify as meeting a listing. **Sullivan v. Zebley**, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990).

Specifically, Keys has argued that the ALJ discussed Listing 1.02, 1.04, and 14.06 inadequately. Listing 1.02, major joint dysfunction, required Keys to demonstrate an impairment

9

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

**20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.02**. The ALJ identified the above requirements and found that the medical evidence did not establish the required difficulty. (Tr. 14). She indicated that Keys did not demonstrate an inability to ambulate or to perform fine and gross movements. (Tr. 14).

Listing 1.04 required Keys to demonstrate a spine disorder that compromised a nerve root, including the cauda equine, or the spinal cord. **20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04**. Additionally, the spine disorder must have

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

**20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04**. The ALJ found no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. (Tr. 14). Moreover, she indicated that Keys's spine disorder did not prevent him from ambulating effectively. (Tr. 14).

Listing 14.06, undifferentiated and mixed connective tissue disease, includes impairments with features of several autoimmune disorders but does not satisfy the requirements for any specific disorder. **20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(D)(5)**. Subsection B of Listing 14.06 required Keys to demonstrate

> B. Repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
> 1. Limitation of activities of daily living.
> 2. Limitation in maintaining social functioning.
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

**20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.06(B)**. The ALJ found that Keys's rheumatoid arthritis failed to demonstrate an inability to ambulate or to perform fine and gross movements or other clinical signs. (Tr. 14). She also concluded that Keys had mild limitations in daily living activities, social functioning, and concentration, persistence, and pace. (Tr. 13).

Keys has claimed that the ALJ performed an inadequate, perfunctory analysis that did not create a logical bridge from the evidence to her conclusion. He also has argued that the ALJ failed to consult a medical expert when deciding whether he met a listing. Additionally, Keys has opined that his medical evidence met Listings 1.02, 1.04, and 14.06. The Commissioner has argued that the ALJ met the step three minimal articulation standard by identifying missing requirements. *See **Pope v. Shalala***, 998 F.2d 473, 481 (7th Cir. 1993), *overruled on other grounds by **Johnson v. Apfel***, 189 F.3d 561, 564 (7th Cir. 1999).

Although the ALJ summarized her step three analysis in a few sentences, her reasoning was not perfunctory or inadequate. She indicated that Keys did not exhibit all the requirements for each listing. For example, she stated that Keys did not exhibit the required physical limitations for each listing and that the medical evidence did not establish required clinical or objective signs. (Tr. 14). The ALJ also discussed Keys's physical impairments in detail and referred to numerous specific exhibits. She reviewed Keys's treatment, including surgery, injections, and physical therapy. She summarized the opinions of Drs. Onamusi and Hedrick, who found that Keys had a normal gait and could perform fine fingering movements. (Tr. 593–94, 715, 719). She also indicated that Keys did not have a marked limitation in daily living activities, social functioning, or concentration, persistence, and pace. Although the ALJ did not review Keys's physical impairments and the medical opinions at step three, the court must read her decision as a whole. *Rice v. Barnhart*, 384 F.3d 363, n.5 (7th Cir. 2004). Moreover, the ALJ did not need to discuss every piece of evidence, despite Keys's claims that she failed to consider specific medical records. *See Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) ("[T]he ALJ is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to her conclusions."). Considering the above, the ALJ supported her step three findings with substantial evidence and built a logical bridge.

Next, Keys has argued that the ALJ improperly afforded great weight to Dr. Brill, a non-examining state agency physician. The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). Generally, an ALJ affords more weight to the opinion of an examining source than the opinion of a non-examining source, but the ultimate weight given depends on the opinion's consistency with the objective medical

evidence, the quality of the explanation, and the source's specialty.  *Givens v. Colvin*, 551 F. App'x 855, 860 (7th Cir. 2013); **20 C.F.R. § 404.1527(c)**.

Keys has claimed that Dr. Brill failed to consider all of his impairments, including rheumatoid arthritis.  He also has indicated that the ALJ's RFC was identical to the state agency assessment.  He has argued that the ALJ failed to explain her reasoning for assigning great weight to Dr. Brill's assessment.  The Commissioner has claimed that the ALJ weighed Dr. Brill's opinion reasonably.  She noted that the ALJ gave great weight to three medical opinions, including Dr. Brill's, that were similar and uncontroverted.  She also indicated that Dr. Brill referenced Dr. Onamusi's assessment, which considered Keys's rheumatoid arthritis.

The ALJ minimally articulated her reasons for crediting Dr. Brill's opinions.  She found his assessment, along with Dr. Sands's affirmation, consistent with Keys's physical examinations and Dr. Onamusi's opinion.  (Tr. 17).  Moreover, she also gave great weight to Dr. Onamusi's opinion because it was consistent with the medical evidence, particularly Keys's most recent physical examinations.  (Tr. 17).  Those three medical opinions were uncontroverted and consistent with the ALJ's RFC assessment.  Keys has argued that the ALJ erred by finding an RFC identical to Dr. Brill's assessment, but it is unclear why that was an error when the ALJ gave great weight to his opinion, which the ALJ found consistent with the other medical opinions in the record.

Last, Keys has argued that the ALJ did not support her vocational findings with substantial evidence.  He has claimed that the ALJ failed to include limitations for concentration, persistence, and pace, exposure to hazards, interacting with others, and upper extremity restrictions in her RFC.  Based on that claim, he also has argued that the hypothetical question posed to the VE was faulty because it did not include the above limitations.  SSR 96-8p explains

how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what she must articulate in her written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, she cannot ignore evidence that undermines her ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citations omitted). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

The Commissioner has argued that the ALJ did not need to include a limitation for concentration, persistence, and pace in the VE hypothetical because she found no limitations were necessary. She has indicated that the ALJ relied on six medical opinions, which found that

14

no limitations were required for exposure to hazards or interacting with others. Additionally, the Commissioner has noted that the ALJ relied on medical evidence that found no upper extremity limitations were necessary. Because the Commissioner has claimed that the ALJ included Keys's limitations supported by the record in her RFC finding, the Commissioner has argued that the ALJ did not need to include the above limitations in her VE hypothetical and could rely on the VE's testimony to support her step five finding.

The ALJ did not include limitations for concentration, persistence, and pace, exposure to hazards, interacting with others, or upper extremity restrictions in her VE hypothetical. However, the ALJ only was required to incorporate those limitations supported by the medical evidence. ***Jens v. Barnhart***, 347 F.3d 209, 213 (7th Cir. 2003). The ALJ did find a mild limitation in concentration, persistence, and pace and social functioning at step two. (Tr. 13). She also indicated that her step two finding was not a RFC assessment. (Tr. 13). The ALJ gave great weight to the State agency psychological consultants, who found that Keys did not have any severe mental impairments. (Tr. 14). She also noted that Keys did not receive any treatment for mental impairments. (Tr. 14). Similarly, the ALJ relied on medical opinions that found no communication or environmental limitations. (Tr. 17, 600, 634). The ALJ also reviewed Keys's alleged physical limitations, including his upper extremity allegations. She summarized the opinions of Drs. Onamusi and Hedrick. (Tr. 16). Based on their examinations, the ALJ found Keys incredible regarding the severity of his physical limitations. (Tr. 16). Moreover, she gave great weight to medical opinions that did not support Keys's allegations or physical limitations. (Tr. 17).

Because the ALJ did not find that the medical evidence supported Keys's alleged limitations, she did not need to include those limitations in her RFC or VE hypothetical. She

also discussed his alleged limitations adequately. She reviewed the relevant medical evidence, including medical opinions and examinations, gave great weight to opinions that contradicted Keys's allegations, and found the severity of his allegations incredible. She supported her RFC finding with substantial evidence and built a logical bridge from the evidence to her conclusions.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED this 5th day of February, 2016.

/s/ Andrew P. Rodovich
United States Magistrate Judge